**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**FILED**

September 20, 2016

Lyle W. Cayce
Clerk

No. 15-50759

DEFENSE DISTRIBUTED; SECOND AMENDMENT FOUNDATION,
INCORPORATED,

        Plaintiffs - Appellants

v.

UNITED STATES DEPARTMENT OF STATE; JOHN F. KERRY, In His
Official Capacity as the Secretary of the Department of State;
DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State
Bureau of Political Military Affairs; KENNETH B. HANDELMAN,
Individually and in His Official Capacity as the Deputy Assistant Secretary
of State for Defense Trade Controls in the Bureau of Political-Military
Affairs; C. EDWARD PEARTREE, Individually and in His Official Capacity
as the Director of the Office of Defense Trade Controls Policy Division;
SARAH J. HEIDEMA, Individually and in Her Official Capacity as the
Division Chief, Regulatory and Multilateral Affairs, Office of Defense Trade
Controls Policy; GLENN SMITH, Individually and in His Official Capacity as
the Senior Advisor, Office of Defense Trade Controls,

        Defendants - Appellees

Appeal from the United States District Court
for the Western District of Texas

Before DAVIS, JONES, and GRAVES, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

       Plaintiffs-Appellants Defense Distributed and Second Amendment
Foundation, Inc. have sued Defendants-Appellees, the United States

No. 15-50759

Department of State, the Secretary of State, the DDTC, and various agency employees (collectively, the "State Department"), seeking to enjoin enforcement of certain laws governing the export of unclassified technical data relating to prohibited munitions. Because the district court concluded that the public interest in national security outweighs Plaintiffs-Appellants' interest in protecting their constitutional rights, it denied a preliminary injunction, and they timely appealed. We conclude the district court did not abuse its discretion and therefore affirm.

## I.     Background

Defense Distributed is a nonprofit organization operated, in its own words, "for the purpose of promoting popular access to arms guaranteed by the United States Constitution" by "facilitating global access to, and the collaborative production of, information and knowledge related to the 3D printing of arms; and by publishing and distributing such information and knowledge on the Internet at no cost to the public." Second Amendment Foundation, Inc. is a nonprofit devoted more generally to promoting Second Amendment rights.

Defense Distributed furthers its goals by creating computer files used to create weapons and weapon parts, including lower receivers for AR-15 rifles.[1] The lower receiver is the part of the firearm to which the other parts are attached. It is the only part of the rifle that is legally considered a firearm under federal law, and it ordinarily contains the serial number, which in part allows law enforcement to trace the weapon. Because the other gun parts, such as the barrel and magazine, are not legally considered firearms, they are not

---

[1] The district court capably summarized the facts in its memorandum opinion and order. *See Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 686-88 (W.D. Tex. 2015). The facts set out in this opinion come largely from the district court's opinion and the parties' briefs.

No. 15-50759

regulated as such. Consequently, the purchase of a lower receiver is restricted and may require a background check or registration, while the other parts ordinarily may be purchased anonymously.

The law provides a loophole, however: anyone may make his or her own unserialized, untraceable lower receiver for personal use, though it is illegal to transfer such weapons in any way. Typically, this involves starting with an "80% lower receiver," which is simply an unfinished piece of metal that looks quite a bit like a lower receiver but is not legally considered one and may therefore be bought and sold freely. It requires additional milling and other work to turn into a functional lower receiver. Typically this would involve using jigs (milling patterns), a drill press, other tools, and some degree of machining expertise to carefully complete the lower receiver. The result, combined with the other, unregulated gun parts, is an unserialized, untraceable rifle.

Defense Distributed's innovation was to create computer files to allow people to easily produce their own weapons and weapon parts using relatively affordable and readily available equipment. Defense Distributed has explained the technologies as follows:

> Three-dimensional ("3D") printing technology allows a computer to "print" a physical object (as opposed to a two-dimensional image on paper). Today, 3D printers are sold at stores such as Home Depot and Best Buy, and the instructions for printing everything from jewelry to toys to car parts are shared and exchanged freely online at sites like GrabCAD.com and Thingiverse.com. Computer numeric control ("CNC") milling, an older industrial technology, involves a computer directing the operation of a drill upon an object. 3D printing is "additive;" using raw materials, the printer constructs a new object. CNC milling is "subtractive," carving something (more) useful from an existing object.
>
> Both technologies require some instruction set or "recipe"—in the case of 3D printers, computer aided design ("CAD") files, typically

3

in .stl format; for CNC machines, text files setting out coordinates and functions to direct a drill.[2]

Defense Distributed's files allow virtually anyone with access to a 3D printer to produce, among other things, Defense Distributed's single-shot plastic pistol called the Liberator and a fully functional plastic AR-15 lower receiver. In addition to 3D printing files, Defense Distributed also sells its own desktop CNC mill marketed as the Ghost Gunner, as well as metal 80% lower receivers. With CNC milling files supplied by Defense Distributed, Ghost Gunner operators are able to produce fully functional, unserialized, and untraceable metal AR-15 lower receivers in a largely automated fashion.

Everything discussed above is legal for United States citizens and will remain legal for United States citizens regardless of the outcome of this case. This case concerns Defense Distributed's desire to share all of its 3D printing and CNC milling files online, available without cost to anyone located anywhere in the world, free of regulatory restrictions.

Beginning in 2012, Defense Distributed posted online, for free download by anyone in the world, a number of computer files, including those for the Liberator pistol (the "Published Files"). On May 8, 2013, the State Department sent a letter to Defense Distributed requesting that it remove the files from the internet on the ground that sharing them in that manner violates certain laws. The district court summarized the relevant statutory and regulatory framework as follows:

> Under the Arms Export Control Act ("AECA"), "the President is authorized to control the import and the export of defense articles and defense services" and to "promulgate regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1). The AECA imposes both civil and criminal penalties for violation of its provisions and implementing regulations, including

---

[2] Plaintiffs-Appellants' Original Brief on Appeal.

monetary fines and imprisonment. *Id.* § 2278(c) & (e). The President has delegated his authority to promulgate implementing regulations to the Secretary of State. Those regulations, the International Traffic in Arms Regulation ("ITAR"), are in turn administered by the DDTC [Directorate of Defense Trade Controls] and its employees. 22 C.F.R. 120.1(a).

The AECA directs that the "defense articles" designated under its terms constitute the United States "Munitions List." 22 U.S.C. § 2778(a)(1). The Munitions List "is not a compendium of specific controlled items," rather it is a "series of categories describing the kinds of items" qualifying as "defense articles." *United States v. Zhen Zhou Wu,* 711 F.3d 1, 12 (1st Cir.) *cert. denied sub nom. Yufeng Wei v. United States,* ——U.S. ——, 134 S. Ct. 365, 187 L. Ed. 2d 160 (2013). Put another way, the Munitions List contains "attributes rather than names." *United States v. Pulungan,* 569 F.3d 326, 328 (7th Cir. 2009) (explaining "an effort to enumerate each item would be futile," as market is constantly changing). The term "defense articles" also specifically includes "technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in" the Munitions List. 22 C.F.R. § 120.6

A party unsure about whether a particular item is a "defense article" covered by the Munitions List may file a "commodity jurisdiction" request with the DDTC. *See* 22 C.F.R. § 120.4 (describing process). The regulations state the DDTC "will provide a preliminary response within 10 working days of receipt of a complete request for commodity jurisdiction." *Id.* § 120.4(e). If a final determination is not provided after 45 days, "the applicant may request in writing to the Director, Office of Defense Trade Controls Policy that this determination be given expedited processing." *Id.*[3]

In short, the State Department contended: (1) the Published Files were potentially related to ITAR-controlled "technical data" relating to items on the USML; (2) posting ITAR-controlled files on the internet for foreign nationals

---

[3] *See Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 687-88 (W.D. Tex. 2015).

to download constitutes "export"; and (3) Defense Distributed therefore must obtain prior approval from the State Department before "exporting" those files. Defense Distributed complied with the State Department's request by taking down the Published Files and seeking commodity jurisdiction requests for them. It did eventually obtain approval to post some of the non-regulated files, but *all* of the Published Files continue to be shared online on third party sites like The Pirate Bay.

Since then, Defense Distributed has not posted any new files online. Instead, it is seeking prior approval from the State Department and/or DDTC before doing so, and it has not obtained such approval. The new files Defense Distributed seeks to share online include the CNC milling files required to produce an AR-15 lower receiver with the Ghost Gunner and various other 3D printed weapons or weapon parts.

## District Court Proceedings

In the meantime, Defense Distributed and Second Amendment Foundation, Inc., sued the State Department, seeking to enjoin them from enforcing the regulations discussed above. Plaintiffs-Appellants argue that the State Department's interpretation of the AECA, through the ITAR regulations, constitutes an unconstitutional prior restraint on protected First Amendment speech, to wit, the 3D printing and CNC milling files they seek to place online.[4] They also claim violations of the Second and Fifth Amendments. Plaintiffs-Appellants' challenges to the regulatory scheme are both facial and as applied, and they ultimately seek a declaration that no prepublication approval is

---

[4] The State Department does not restrict the export of the Ghost Gunner machine itself or the user manual, only the specific CNC milling files used to produce the AR-15 lower receivers with it, as well as all 3D printing files used to produce prohibited weapons and weapon parts.

needed for privately generated unclassified information, whether or not that data may constitute "technical data" relating to items on the USML.

Plaintiffs-Appellants sought a preliminary injunction against the State Department, essentially seeking to have the district court suspend enforcement of ITAR's prepublication approval requirement pending final resolution of this case. The district court denied the preliminary injunction, and Plaintiffs-Appellants timely filed this appeal. We review the denial of a preliminary injunction for abuse of discretion, but we review any questions of law de novo.[5]

> To obtain a preliminary injunction, the applicant must show (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) that his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) that granting the preliminary injunction will not disserve the public interest. "We have cautioned repeatedly that a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements."[6]

We have long held that satisfying one requirement does not necessarily affect the analysis of the other requirements. In *Southern Monorail Co. v. Robbins & Myers, Inc.*, 666 F.2d 185 (5th Cir. Unit B 1982), for example, the district court had denied a preliminary injunction solely because it found that the movant, Robbins & Myers, failed to satisfy the balance of harm requirement. On appeal, Robbins & Myers argued that it had clearly shown a substantial likelihood of success on the merits, and satisfying that requirement should give rise to a presumption of irreparable harm and a presumption that the balance of harm tipped in its favor. We disagreed:

---

[5] *PCI Transp., Inc. v. Fort Worth & W. R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005) (footnotes omitted)

[6] *Id.*

Because we dispose of this case on the balance of harm question, we need not decide and we express no views upon whether a presumption of irreparable injury as a matter of law is appropriate once a party demonstrates a substantial likelihood of success on the merits of an infringement claim. In other words, even assuming arguendo that Robbins & Myers has shown a substantial likelihood of success on the merits of its infringement claim and that irreparable injury should be presumed from such a showing (two issues not addressed by the district court in this case), we still uphold the district court's decision, which rested solely on the balance of harm factor. We agree that Robbins & Myers has failed to carry its burden of showing that the threatened harm to it from the advertisement outweighs the harm to Southern Monorail from the intercept. In addition, we expressly reject Robbins & Myers' suggestion that we adopt a rule that the balance of harm factor should be presumed in the movant's favor from a demonstration of a substantial likelihood of success on the merits of an infringement claim. Such a presumption of the balance of harm factor would not comport with the discretionary and equitable nature of the preliminary injunction in general and of the balance of harm factor in particular. *See Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1026 (7th Cir. 1979), *cert. denied*, 447 U.S. 924, 100 S. Ct. 3016, 65 L. Ed. 2d 1116 (1980) (district court obligated to weigh relative hardship to parties in relation to decision to grant or deny preliminary injunction, even when irreparable injury shown).[7]

The district court concluded that the preliminary injunction should be denied because Plaintiffs-Appellants failed to satisfy the balance of harm and public interest requirements, which do not concern the merits. (Assuming without deciding that Plaintiffs-Appellants have suffered the loss of First and Second Amendment freedoms, they have satisfied the irreparable harm requirement because any such loss, however intangible or limited in time,

---

[7] *Id.* at 187-88.

constitutes irreparable injury.[8]) In extensive dicta comprising nearly two-thirds of its memorandum opinion, the district court also concluded that Plaintiffs-Appellants failed to show a likelihood of success on the merits. Plaintiffs-Appellants timely appealed, asserting essentially the same arguments on appeal. Plaintiffs-Appellants continue to bear the burden of persuasion on appeal.

## Analysis

Because the district court held that Plaintiffs-Appellants only satisfied the irreparable harm requirement, they may obtain relief on appeal only if they show that the district court abused its discretion on all three of the other requirements. The district court denied the preliminary injunction based on its finding that Plaintiffs-Appellants failed to meet the two non-merits requirements by showing that (a) the threatened injury to them outweighs the threatened harm to the State Department, and (b) granting the preliminary injunction will not disserve the public interest. The court only addressed the likelihood of success on the merits as an additional reason for denying the injunction. Because we conclude the district court did not abuse its discretion on its non-merits findings, we decline to address the merits requirement.

The crux of the district court's decision is essentially its finding that the government's exceptionally strong interest in national defense and national security outweighs Plaintiffs-Appellants' very strong constitutional rights under these circumstances. Before the district court, as on appeal, Plaintiffs-Appellants failed to give *any* weight to the public interest in national defense and national security, as the district court noted:

---

[8] *See Def. Distributed*, 121 F. Supp. 3d at 689 (citing *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976); *Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009); *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011)).

No. 15-50759

Plaintiffs rather summarily assert the balance of interests tilts in their favor because "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax,* 670 F.3d 1111, 1132 (10th Cir. 2012); *see also Jackson Women's Health Org. v. Currier,* 760 F.3d 448, 458 n. 9 (5th Cir. 2014) (district court did not abuse its discretion in finding injunction would not disserve public interest because it will prevent constitutional deprivations).[9]

Ordinarily, of course, the protection of constitutional rights *would* be the highest public interest at issue in a case. That is not necessarily true here, however, because the State Department has asserted a very strong public interest in national defense and national security. Indeed, the State Department's stated interest in preventing foreign nationals—including all manner of enemies of this country—from obtaining technical data on how to produce weapons and weapon parts is not merely tangentially related to national defense and national security; it lies squarely within that interest.

In the State Department's interpretation, its ITAR regulations directly flow from the AECA and are the only thing preventing Defense Distributed from "exporting" to foreign nationals (by posting online) prohibited technical data pertaining to items on the USML. Plaintiffs-Appellants disagree with the State Department's interpretation, but that question goes to the merits.

Because Plaintiffs-Appellants' interest in their constitutional rights and the State Department's interest in national defense and national security are both public interests, the district court observed that "[i]n this case, the inquiry [on these two requirements] essentially collapses."[10] It reasoned:

While Plaintiffs' assertion of a public interest in protection of constitutional rights is well-taken, it fails to consider the public's keen interest in restricting the export of defense articles. *See Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 24–25, 129 S.

---

[9] *Id.* at 689.
[10] *Id.*

10

Ct. 365, 172 L. Ed. 2d 249 (2008) (discussing failure of district court to consider injunction's adverse impact on public interest in national defense); *Am. Civil Liberties Union v. Clapper,* 785 F.3d 787, 826 (2nd Cir. 2015) (characterizing maintenance of national security as "public interest of the highest order"). It also fails to account for the interest—and authority—of the President and Congress in matters of foreign policy and export. *See Haig v. Agee,* 453 U.S. 280, 292, 101 S. Ct. 2766, 69 L. Ed. 2d 640 (1981) (matters relating to conduct of foreign relations "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference"); *United States v. Pink,* 315 U.S. 203, 222–23, 62 S. Ct. 552, 86 L. Ed. 796 (1942) (conduct of foreign relations "is committed by the Constitution to the political departments of the Federal Government"); *Spectrum Stores, Inc. v. Citgo Petroleum Corp.,* 632 F.3d 938, 950 (5th Cir. 2011) (matters implicating foreign relations and military affairs generally beyond authority of court's adjudicative powers).

As to Plaintiff's second contention, that an injunction would not bar Defendants from controlling the export of classified information, it is significant that Plaintiffs maintain the posting of files on the Internet for free download does not constitute "export" for the purposes of the AECA and ITAR. But Defendants clearly believe to the contrary. Thus, Plaintiffs' contention that the grant of an injunction permitting them to post files that Defendants contend are governed by the AECA and ITAR would not bar Defendants from controlling "export" of such materials stand in sharp [contrast] to Defendants' assertion of the public interest. The Court thus does not believe Plaintiffs have met their burden as to the final two prongs necessary for granting Plaintiffs a preliminary injunction. Nonetheless, in an abundance of caution, the Court will turn to the core of Plaintiffs' motion for a preliminary injunction, whether they have shown a likelihood of success on their claims[.][11]

Plaintiffs-Appellants suggest the district court disregarded their paramount interest in protecting their constitutional rights. That is not so. The district court's decision was based not on discounting Plaintiffs-Appellants'

---

[11] *Id.* at 689-90.

interest but rather on finding that the public interest in national defense and national security is stronger here, and the harm to the government is greater than the harm to Plaintiffs-Appellants. We cannot say the district court abused its discretion on these facts.

Because both public interests asserted here are strong, we find it most helpful to focus on the balance of harm requirement, which looks to the relative harm to both parties if the injunction is granted or denied. If we affirm the district court's denial, but Plaintiffs-Appellants eventually prove they are entitled to a permanent injunction, their constitutional rights will have been violated in the meantime, but only temporarily. Plaintiffs-Appellants argue that this result is absurd because the Published Files are already available through third party websites such as the Pirate Bay, but granting the preliminary injunction sought by Plaintiffs-Appellants would allow them to share online not only the Published Files but also any new, previously unpublished files. That leads us to the other side of the balance of harm inquiry.

If we reverse the district court's denial and instead grant the preliminary injunction, Plaintiffs-Appellants would legally be permitted to post on the internet as many 3D printing and CNC milling files as they wish, including the Ghost Gunner CNC milling files for producing AR-15 lower receivers and additional 3D-printed weapons and weapon parts. Even if Plaintiffs-Appellants eventually fail to obtain a permanent injunction, the files posted in the interim would remain online essentially forever, hosted by foreign websites such as the Pirate Bay and freely available worldwide. That is not a far-fetched hypothetical: the initial Published Files are still available on such sites, and Plaintiffs-Appellants have indicated they will share additional, previously unreleased files as soon as they are permitted to do so. Because those files would never go away, a preliminary injunction would function, in effect, as a

No. 15-50759

permanent injunction as to all files released in the interim. Thus, the national defense and national security interest would be harmed forever. The fact that national security might be permanently harmed while Plaintiffs-Appellants' constitutional rights might be temporarily harmed strongly supports our conclusion that the district court did not abuse its discretion in weighing the balance in favor of national defense and national security.

In sum, we conclude that the district court did not abuse its discretion in denying Plaintiffs-Appellants' preliminary injunction based on their failure to carry their burden of persuasion on two of the three non-merits requirements for preliminary injunctive relief, namely the balance of harm and the public interest. We therefore affirm the district court's denial and decline to reach the question of whether Plaintiffs-Appellants have demonstrated a substantial likelihood of success on the merits.[12]

---

[12] The dissent disagrees with this opinion's conclusion that the balance of harm and public interest factors favor the State Department such that Plaintiffs-Appellants' likelihood of success on the merits could not change the outcome. The dissent argues that we "should have held that the domestic internet publication" of the technical data at issue presents no "immediate danger to national security, especially in light of the fact that many of these files are now widely available over the Internet and that the world is awash with small arms."

We note the following: (1) If Plaintiffs-Appellants' publication on the Internet were truly domestic, i.e., limited to United States citizens, there is no question that it would be legal. The question presented in this case is whether Plaintiffs-Appellants may place such files on the Internet for unrestricted worldwide download. (2) This case does not concern only the files that Plaintiffs-Appellants previously made available online. Plaintiffs-Appellants have indicated their intent to make many more files available for download as soon as they are legally allowed to do so. Thus, the bulk of the potential harm has not yet been done but could be if Plaintiffs-Appellants obtain a preliminary injunction that is later determined to have been erroneously granted. (3) The world may be "awash with small arms," but it is not yet awash with the ability to make untraceable firearms anywhere with virtually no technical skill. For these reasons and the ones we set out above, we remain convinced that the potential permanent harm to the State Department's strong national security interest outweighs the potential temporary harm to Plaintiffs-Appellants' strong First Amendment interest.

As to the dissent's extensive discussion of Plaintiffs-Appellants' likelihood of success on the merits of the First Amendment issue, we take no position. Even a First Amendment violation does not necessarily trump the government's interest in national defense. We simply hold that Plaintiffs-Appellants have not carried their burden on two of the four requirements for a preliminary injunction: the balance of harm and the public interest.

No. 15-50759

We are mindful of the fact that the parties and the amici curiae in this case focused on the merits, and understandably so. This case presents a number of novel legal questions, including whether the 3D printing and/or CNC milling files at issue here may constitute protected speech under the First Amendment, the level of scrutiny applicable to the statutory and regulatory scheme here, whether posting files online for unrestricted download may constitute "export," and whether the ITAR regulations establish an impermissible prior restraint scheme. These are difficult questions, and we take no position on the ultimate outcome other than to agree with the district court that it is not yet time to address the merits.

On remand, the district court eventually will have to address the merits, and it will be able to do so with the benefit of a more fully developed record. The amicus briefs submitted in this case were very helpful and almost all supported Plaintiffs-Appellants' general position. Given the importance of the issues presented, we may only hope that amici continue to provide input into the broader implications of this dispute.

## Conclusion

For the reasons set out above, we conclude that the district court did not abuse its discretion by denying the preliminary injunction on the non-merits requirements. AFFIRMED.

No. 15-50759

JONES, Circuit Judge, dissenting:

This case poses starkly the question of the national government's power to impose a prior restraint on the publication of lawful, unclassified, not-otherwise-restricted technical data to the Internet under the guise of regulating the "export" of "defense articles." I dissent from this court's failure to treat the issues raised before us with the seriousness that direct abridgements of free speech demand.

**I.**

From late 2012 to early 2013, plaintiff Defense Distributed posted on the Internet, free of charge, technical information including computer assisted design files (CAD files) about gun-related items including a trigger guard, two receivers, an ArmaLite Rifle-15 magazine,[1] and a handgun named "The Liberator." None of the published information was illegal, classified for national security purposes, or subject to contractual or other distribution restrictions. In these respects the information was no different from technical data available through multiple Internet sources from widely diverse publishers. From scientific discussions to popular mechanical publications to personal blog sites, information about lethal devices of all sorts, or modifications to commercially manufactured firearms and explosives, is readily available on the Internet.

What distinguished Defense Distributed's information at that time, however, was its computer files designed for 3D printer technology that could be used to "print" parts and manufacture, with the proper equipment and know-how, a largely plastic single-shot handgun. The Liberator technology

---

[1] The ArmaLite Rifle, design 15 is rifle platform commonly abbreviated AR-15, a registered trademark of Colt's Inc. AR-15, Registration No. 0,825,581.

15

No. 15-50759

drew considerable press attention[2] and the relevant files were downloaded "hundreds of thousands of times." In May 2013, Defense Distributed received a warning letter from the U.S. State Department stating in pertinent part:

> DDTC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the USML.  Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR.
>
> Pursuant to §127.1 of the ITAR, it is unlawful to export any defense article or technical data for which a license or written approval is required without first obtaining the required authorization from the DDTC.  Please note that disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad, is considered an export under §120.17 of the ITAR.

The letter then advised Defense Distributed that it must "remove [its information] from public access" immediately, pending its prompt request for and receipt of approval from DDTC.

In a nearly forty-year history of munitions "export" controls, the State Department had never sought enforcement against the posting of any kind of files on the Internet.  Because violations of the cited regulations carry severe civil and criminal penalties,[3] Defense Distributed had no practical choice but to remove the information and seek approval to publish from DDTC.  It took

---

[2] According to Defense Distributed, the Liberator files were covered, inter alia, by Forbes, CNN, NBC News, and the Wall Street Journal.

[3] Fines may exceed a million dollars and imprisonment, for violations premised on specific intent to violate, up to twenty years.    28 U.S.C. § 2778(c); *United States v. Covarrubias*, 94 F.3d 172 (5th Cir. 1996).

No. 15-50759

the government entities two years to refuse to exempt most of the files from the licensing regime.

Defense Distributed filed suit in federal court to vindicate, inter alia, its First Amendment right to publish without prior restraint[4] and sought the customary relief of a temporary injunction to renew publication. This appeal stems from the district court's denial of relief. Undoubtedly, the denial of a temporary injunction in this case will encourage the State Department to threaten and harass publishers of similar non-classified information. There is also little certainty that the government will confine its censorship to Internet publication. Yet my colleagues in the majority seem deaf to this imminent threat to protected speech. More precisely, they are willing to overlook it with a rote incantation of national security, an incantation belied by the facts here and nearly forty years of contrary Executive Branch pronouncements.

This preliminary injunction request deserved our utmost care and attention. Interference with First Amendment rights for any period of time, even for short periods, constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 2690 (1976) (citing *New York Times Co. v. United States*, 403 U.S. 713, 91 S. Ct. 2140 (1971)); *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295–97 (5th Cir. 2012). Defense Distributed has been denied publication rights for over three years. The district court, moreover, clearly erred in gauging the level of constitutional protection to which this speech is entitled: intermediate scrutiny is

---

[4] To simplify discussion, I refer to Defense Distributed as the plaintiff, but it is joined in litigation by the Second Amendment Foundation, and its arguments are adopted and extended by numerous amici curiae. Believing that the deprivation of a merits opinion is most critical to Defense Distributed's First Amendment claim, I do not discuss the plaintiffs' other non-frivolous claims premised on ultra vires, the Second Amendment and procedural due process.

17

inappropriate for the content-based restriction at issue here. (Why the majority is unwilling to correct this obvious error for the sake of the lower court's getting it right on remand is a mystery).

The district court's mischaracterization of the standard of scrutiny fatally affected its approach to the remaining prongs of the test for preliminary injunctive relief. Without a proper assessment of plaintiff's likelihood of success on the merits—arguably the most important of the four factors necessary to grant a preliminary injunction, *Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005)—the district court's balancing of harms went awry.[5] We should have had a panel discussion about the government's right to censor Defense Distributed's speech.

Since the majority are close to missing in action, and for the benefit of the district court on remand, I will explain why I conclude that the State Department's application of its "export" control regulations to this domestic Internet posting appears to violate the governing statute, represents an irrational interpretation of the regulations, and violates the First Amendment as a content-based regulation and a prior restraint.

---

[5] *See Tex. v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975) ("none of the four prerequisites has a fixed quantitative value. Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus."). *Southern Monorail Co. v. Robbins & Myers, Inc.*, 666 F.2d 185 (5th Cir. 1982), is the only case relied upon by the majority for the proposition that we may dispense with addressing the likelihood of success on the merits if we conclude that the parties have not satisfied one of the other elements of the test for granting a preliminary injunction. That case is distinguishable. First, *Southern Monorail* was a private action concerning trademark infringement, not a case involving a claim of the invasion of constitutional rights by the federal government. *See id.* at 185–86. Second, "the district court denied the injunction *solely* on the basis of the third factor, concerning the balance of harm." *Id.* at 186 (emphasis added). In this case, by contrast, the district court addressed each of the preliminary injunction factors, thus allowing us to consider its resolution of each factor.

No. 15-50759

## II.

**A.    Regulatory Framework**

The Arms Export Control Act of 1976 ("AECA") authorizes the President to "control the import and the export of defense articles and defense services." 22 U.S.C. § 2778(a)(1). The President "is authorized to designate those items which shall be considered as defense articles and defense services . . . and to promulgate regulations for the import and export of such articles and services." *Id.* "The items so designated shall constitute the United States Munitions List." *Id.* The statute does not define "export," but "defense items" includes defense articles, defense services "and related technical data." 22 U.S.C. § 2778(j)(4)(A).

In response to this directive, the State Department promulgated the International Traffic in Arms Regulations ("ITAR"), which contain the United States Munitions List ("USML"). 22 C.F.R. § 121.1. The USML enumerates a vast array of weaponry, ammunition, and military equipment including, for present purposes, "firearms," defined as "[n]onautomatic and semi-automatic firearms to caliber .50 inclusive," 22 C.F.R. § 121.1, Category I, item (a).

The USML also broadly designates "technical data" relating to firearms as subject to the ITAR. 22 C.F.R. § 121.1, Category I, item (i). "Technical data" encompass any information "which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles including "information in the form of blueprints, drawings, photographs, plans, instructions or documentation." 22 C.F.R. § 120.10(a)(1).

Notably excepted from "technical data" is information concerning general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities, or information in the public domain."

19

22 C.F.R. § 120.10(b). Further, the "public domain" covers "information which is published and which is generally accessible or available to the public" through newsstands, bookstores, public libraries, conferences, meetings, seminars, trade shows, and "fundamental research in science and engineering at accredited institutions of higher learning in the U.S. where the resulting information is ordinarily published and shared broadly in the scientific community." 22 C.F.R. § 120.11(a).[6]

Under the ITAR it is unlawful to "export or attempt to export from the United States any defense article or technical data" without first obtaining a license or written approval from the Directorate of Defense Trade Controls ("DDTC"), a division of the State Department. 22 C.F.R. § 127.1(a)(1). When Defense Distributed published technical data on the Internet, the State Department defined "export" broadly, as, *inter alia,* "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad." 22 C.F.R. § 120.17(a)(4).[7]

---

[6] This provision only appears to permit dissemination of information *already* in the public domain. Indeed, the State Department has explicitly taken the position in this litigation and in a June 2015 Notice of Proposed Rulemaking that an individual wishing to place technical data in the public domain must obtain State Department approval. 80 Fed. Reg. at 31,528. The State Department has proposed, but has not yet adopted, a rule to make this distinction more explicit. *See id.*

[7] Effective September 1, 2016, however, the State Department has amended that provision, now defining an export as, "[r]eleasing or otherwise transferring technical data to a foreign person in the United States." *Id.* § 120.17(a)(2); *see also* International Traffic in Arms: Revisions to Definition of Export and Related Definitions, 81 Fed. Reg. 35,611, 35,616 (June 3, 2016). Moreover, in June 2015, the State Department issued a Notice of Proposed Rulemaking, which proposed adding to the term "export" "[m]aking technical data available via a publicly available network (*e.g.*, the Internet)." This, of course, is the open-ended definition of "export" urged by the State Department in this litigation. *See* International Traffic in Arms: Revisions to Definitions of Defense Services, Technical Data, and Public Domain, 80 Fed. Reg. 31,525, 31,535 (proposed June 3, 2015). The Notice advised that the State Department intends to address that definition in a separate rulemaking and for now allows the "existing ITAR controls [to] remain in place." 81 Fed. Reg. at 35,613.

No. 15-50759

In order to resolve doubts about whether an "export" is covered by ITAR, parties may request a "commodity jurisdiction" determination from the DDTC, which will determine each request on a "case-by-case basis," 22 C.F.R. § 120.4(a), taking into account "the form and fit of the article; and [t]he function and performance capability of the article." 22 C.F.R. § 120.4 (d)(2)(i)–(ii).

The commodity jurisdiction process could, in theory, be avoided if the particular export is exempt from the DDTC process. 22 C.F.R. § 125.4. As relevant here, "[t]echnical data approved for public release (i.e., unlimited distribution) by the cognizant U.S. Government department or agency or Office of Freedom of Information and Security Review" is exempt from the DDTC approval process. 22 C.F.R. § 125.4(b)(13). Under this rubric, the Defense Office of Prepublication and Security Review ("DOPSR"), housed in the Department of Defense's Defense Technical Information Center, "is responsible for managing the Department of Defense security review program, [and] reviewing written materials both for public and controlled release." Defense Office of Prepublication and Security Review (DOPSR), EXECUTIVE SERVS. DIRECTORATE ONLINE, http://www.dtic.mil/whs/esd/osr/ (last visited Aug. 22, 2016). The plaintiff's experience suggests that, in practice, DOPSR will not act on requests for exemptions concerning items not clearly subject to the ITAR until DDTC issues a commodity jurisdiction determination.

The DDTC is required to provide a final commodity jurisdiction determination within 45 days of a commodity jurisdiction request, but if it is not then resolved, an applicant may request expedited processing. 22 C.F.R. § 120.4(e). The DDTC has been criticized by the Government Accountability Office and the Office of Inspector General for routinely failing to meet deadlines. In this case, it took nearly two years for DDTC to rule on the

plaintiff's commodity jurisdiction applications. Although an applicant may appeal an unfavorable commodity jurisdiction determination within the State Department, *Id.* § 120.4(g), Congress has excluded from judicial review the agency's discretionary decisions in "designat[ing] . . . items as defense articles or defense services." 22 U.S.C. § 2778(h); 22 C.F.R. § 128.1. [8]

Should the DDTC determine, as here, that technical data are subject to the ITAR, an "export" license is required before the information may be posted online. But the license may be denied whenever the State Department "deems such action to be in furtherance of world peace, the national security of the United States, or is otherwise advisable." 22 C.F.R. § 126.7(a)(1). There is a nominal 60-day deadline for a licensing decision, which is riddled with exceptions, and denial of an export license is expressly exempt from judicial review. *See* 22 C.F.R. § 128.1.

I would hardly deny that the Department of Justice has good grounds for prosecuting attempts to export weapons and military technology illegally to foreign actors. Previous prosecutions have targeted defendants, *e.g.*, who

---

[8] While 22 U.S.C. § 2778 (h) withholds judicial review as noted, 22 C.F.R. § 128.1 purports more broadly to preclude judicial review over the Executive's implementation of the AECA under the Administrative Procedure Act. I would construe these provisions narrowly to avoid difficult questions that might arise were the Government to take the position that these provisions prevent judicial review for all claims, including those founded on the Constitution. *See Kirby Corp v. Pena*, 109 F.3d 258, 261 (5th Cir. 1997) ("There is a strong presumption that Congress intends there to be judicial review of administrative agency action . . . and the government bears a 'heavy burden' when arguing that Congress meant to withdraw all judicial review."); *Dart v. United States*, 848 F.2d 217, 221 (D.C. Cir. 1988) ("If the wording of a preclusion clause is less than absolute, the presumption of judicial review also favors a particular *category* of plaintiffs' claims."); *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2142 (2016) (Agency "shenanigans" are "properly reviewable . . . under the Administrative Procedure Act, which enables reviewing courts to set aside agency action that is contrary to constitutional right, in excess of statutory jurisdiction, or arbitrary [and] capricious.") (internal quotations omitted).

No. 15-50759

attempted to deliver WMD materials to North Korea, who sought to distribute drone and missile schematics to China, and who attempted to license chemical purchasing software to companies owned by the Iranian government.[9] Defense Distributed agrees, moreover, that the Government may prosecute individuals who email classified technical data to foreign individuals or directly assist foreign actors with technical military advice. *See*, *e.g.*, *United States v. Edler Industries, Inc.*, 579 F.2d 516 (9th Cir. 1978), construing prior version of AECA. Yet, as plaintiff points out, at the time that DDTC stifled Defense Distributed's online posting, there were no publicly known enforcement actions in which the State Department purported to require export licenses or prior approval for the domestic posting of lawful, unclassified, not-otherwise-restricted information on the Internet.

While Defense Distributed has been mired in this thicket of regulation, the CAD files that it published continue to be available to the international public to this day on websites such as the Pirate Bay. Moreover, technology has not stood still: design files are now available on the Internet for six- and eight-shot handguns that can be produced with 3D printing largely out of plastic materials. *See*, *e.g.*, Scott J. Grunewald, "The World's First Fully Printed Revolver is Here", 3DPrintBoard.com (Nov. 23, 2015) (site visited 9/14/2016).

**B.    Discussion**

As applied to Defense Distributed's publication of technical data, the State Department's prepublication approval and license scheme lacks

---

[9] *See* DEPARTMENT OF JUSTICE, SUMMARY OF MAJOR U.S. EXPORT ENFORCEMENT, ECONOMIC ESPIONAGE, TRADE SECRET AND EMBARGO-RELATED CRIMINAL CASES *(January 2009 to the present: updated August 12, 2015)* 3, 11, 86 (2015), *available at* https://www.pmddtc.state.gov/compliance/ documents/OngoingExportCaseFactSheet.pdf.

statutory and regulatory authorization and invades the plaintiff's First Amendment rights because it is both a content-based regulation that fails strict scrutiny and an unconstitutional prior restraint on protected speech.[10]

1. The Statute and its Regulatory Interpretation.

Whether AECA itself, concerned with the "export" of defense article related technical data, authorizes prepublication censorship of domestic publications on the Internet is at least doubtful. Further, construing the State Department's regulations for such a purpose renders them incoherent and unreasonable.

It is necessary first to analyze the statute under which the State Department presumed to enact its regulations and, under the first prong of *Chevron* analysis, what the statute means.[11] The term "export" is not defined in the AECA, is not a term of legal art, and is not ambiguous. Under standard canons of statutory construction, "export" should bear its most common meaning. According to dictionaries, the verb "export" means "to ship (commodities) to other countries or places for sale, exchange, etc." *United States v. Ehsam*, 163 F.3d 858, 859 (4th Cir. 1998) (citing *The Random House Dictionary of the English Language* 682 (2d ed.1987)); *Export, Black's Law Dictionary* (10th ed. 2014) ("To send, take, or carry (a good or commodity) out of the country; to transport (merchandise) from one country to another in the course of trade"); *United States v. Dien Duc Huynh*, 246 F.3d 734, 741 (5th Cir. 2001) ("Exportation occurs when the goods are shipped to another country").

---

[10] For simplicity only, I do not here address plaintiffs' vagueness claim.

[11] It is hard to say whether the State Department's interpretation of AECA should be analyzed under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842, 104 S. Ct. 2778, 2781 (1984) or *United States v. Mead Corp.*, 533 U.S. 218, 227–28, 121 S. Ct. 2164, 2171–72 (2001). I refer to *Chevron* analysis *arguendo* because it captures both the statute and the reasonableness of the regulations.

No. 15-50759

As the court explained in *Ehsam*, which interpreted a Presidential proclamation banning "exportation" of goods or technology to Iran, "[t]hese definitions vary in specificity, but all make clear that exportation involves the transit of goods from one country to another for the purpose of trade." *Id.  See also Swan v. Finch Co. v. United States*,  190 U.S. 143, 145 (1903) (the "legal notion…of exportation is a severance of goods from the mass of things belonging to this country with an intention of uniting them to things belonging to some foreign country or another").  As against a claim that the rule of lenity should apply, the *Ehsam* court explicitly held that "export" is unambiguous. *Id. at* 859–60

Given this construction of "export" by a fellow circuit court, we have no reason to hold that Congress deviated from the term's plain meaning, particularly so significantly as to encompass the domestic publication on the Internet, without charge and therefore without any "trade," of lawful, nonclassified, nonrestricted information.  "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *King v. Burwell*, 135 S. Ct. 2480, 2495 (2015) (internal quotation omitted).  Pursuant to *Chevron,* where the meaning of a statute is plain, a federal agency has no warrant to act beyond the authority delegated by Congress.  *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43, 104 S. Ct. 2778, 2781 (1984).  The State Department's briefing makes no effort to address the statutory language, which must be read in light of established case law and the term's ordinary meaning and the rule of constitutional avoidance.

This determination of the meaning of "export" under *Chevron* step one would normally resolve the case. For the sake of argument, however, it is also clear that the State Department regulations fail the second step as well.  Under

the second step of *Chevron* analysis, they may be upheld only if they represent a "reasonable" construction of the statute. *Chevron*, 467 U.S. at 844, 104 S. Ct. at 2782. Defense Distributed and its amici challenge the regulations' interpretation of "export" and the "public domain" exception to the definition of "technical data." Although the majority opinion adopts the State Department's litigating position that "export" refers only to publication on the Internet, where the information will inevitably be accessible to foreign actors, the warning letter to Defense Distributed cited the exact, far broader regulatory definition: "export" means "disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States of abroad." There is embedded ambiguity, and disturbing breadth, in the State Department's discretion to prevent the dissemination (without an "export" license) of lawful, non-classified technical data to foreign persons within the U.S. The regulation on its face, as applied to Defense Distributed, goes far beyond the proper statutory definition of "export."

Even if "export" in AECA could bear a more capacious interpretation, applying the State Department's regulatory interpretation to the non-transactional publication of Defense Distributed's files on the Internet is unreasonable. In terms of the regulations themselves, how this expansive definition of "export" interacts with the "public domain" exception is unclear at best. If any dissemination of information bearing on USML technical data to foreign persons within the U.S. is potentially an "export," then facilitating domestic publication of such information free of charge can never satisfy the "public domain" exception because newspapers, libraries, magazines, conferences, etc. may all be accessed by foreign persons. The State Department's *ipse dixit* that "export" is consistent with its own "public domain" regulation is incoherent and unreasonable. Even if these regulations are

consistent, however, attempting to exclude the Internet from the "public domain," whose definition does not currently refer to the Internet, is irrational and absurd. The Internet has become the quintessential "public domain." The State Department cannot have it both ways, broadly defining "export" to cover non-transactional publication within the U.S. while solely and arbitrarily excluding from the "public domain" exception the Internet publication of Defense Distributed's technical data.

The root of the problem is that the State Department's litigating position and its regulations put more weight on "export" than any reasonable construction of the statute will bear. "Export" and "publication" are functionally different concepts. *Cf. Bond*, 134 S. Ct. at 2090 ("[s]aying that a person 'used a chemical weapon conveys a very different idea than saying the person 'used a chemical in a way that caused some harm.' " Not only does the State Department fail to justify according its interpretation *Chevron* deference, but the doctrine of constitutional avoidance establishes that *Chevron* deference would be inappropriate anyway. That doctrine provides that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988); *see also id.* at 574–75 (stating that although the agency interpretation at issue "would normally be entitled to deference," "[a]nother rule of statutory construction [constitutional avoidance]. . . is pertinent here"); *see also Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001) ("We thus read the statute as written to avoid the significant constitutional and federalism questions raised by respondents' interpretation, and therefore reject the

request for administrative deference."). As the following constitutional discussion shows, the Executive Branch has consistently recognized the conceptual difference between "export" and "publication", and its constitutional significance, throughout the forty-year history of the AECA. It is only the novel threatened enforcement in this case that brings to the fore the serious problems of censorship that courts are bound to address.

2.   The First Amendment—Content-based speech restriction.

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015). "Government regulation of speech is content-based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 2227. "A speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter:" consequently, even a viewpoint neutral law can be content-based. *Id.* at 2230. "Strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based." *Id.* at 2228.

The prepublication review scheme at issue here would require government approval and/or licensing of any domestic publication on the Internet of lawful, non-classified "technical information" related to "firearms" solely because a foreign national might view the posting. As applied to the publication of Defense Distributed's files, this process is a content-based restriction on the petitioners' domestic speech "because of the topic discussed." *Reed*, 135 S. Ct. at 2227. Particularly relevant to this case is *Holder v. Humanitarian Law Proj.*, 561 U.S. 1, 27–28, 130 S. Ct. 2705, 2723–24 (2010),

in which the Supreme Court held that as applied, a criminal statute forbidding the provision of material support and resources to designated terrorist organizations was content based and required strict scrutiny review. The Court there rejected the government's assertion that although the plaintiffs were going to provide legal training and political advocacy to Mideast terrorist organizations, the statute criminalized "conduct" and only incidentally affected "speech." Rejecting this incidental burden argument for intermediate scrutiny review, the Court stated the obvious: "[p]laintiffs want to speak to the PKK and the LTTE, and whether they may do so under §2239B depends on what they say:" if their speech concerns "specialized knowledge" it is barred, but it "if it imparts only general or unspecialized knowledge" it is permissible). *Humanitarian Law Proj.*, 130 S. Ct. at 2724.

The State Department barely disputes that computer-related files and other technical data are speech protected by the First Amendment. *See Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 445–49 (2d Cir. 2001) (discussing level of scrutiny owed for "speech" in the form of a decryption computer program). There are CAD files on the Internet and designs, drawings, and technical information about myriad items—jewelry, kitchen supplies, model airplanes, or clothing, for example—that are of no interest to the State Department. Only because Defense Distributed posted technical data referring to firearms covered generically by the USML does the government purport to require prepublication approval or licensing. This is pure content-based regulation.[12]

---

[12] The Ninth Circuit held in *United States v. Mak* that "the AECA and its implementing regulations are content-neutral" because "[t]he purpose of the AECA does not rest upon disagreement with the message conveyed," and because "ITAR defines the technical data based on its *function* and not its viewpoint." 683 F.3d 1126, 1134–35 (9th Cir. 2012). *Mak* is distinguishable for a number of reasons. First, the defendant was prosecuted for

No. 15-50759

The Government's argument that its regulatory scheme is content-neutral because it is focused on curbing harmful secondary effects rather than Defense Distributed's primary speech is unpersuasive. The Supreme Court explained this distinction in *Boos v. Barry*, which overturned an ordinance restricting criticism of foreign governments near their embassies because it "focus[es] on the direct impact of speech on its audience." Secondary effects of speech, as the Court understood, include "congestion, [] interference with ingress or egress, [] visual clutter, or [] the need to protect the security of embassies", which are the kind of regulations that underlie *Renton v. Playtime Theaters*. 485 U.S. 312, 321, 108 S. Ct. 1157, 1163–64 (1988). Similarly, the regulation of speech here is focused on the "direct impact of speech on its audience" because the government seeks to prevent certain listeners—foreign nationals—from using the speech about firearms to create guns.

The State Department also asserts that the ITAR regulatory scheme is not content-based because the information here at issue is "functional," that is, that downloading the Defense Distributed files directly enables the creation of 3D printed gun and gun components "at the push of a button." This argument is flawed factually and legally. First, more than CAD (or CNC) files are involved in the information sought to be regulated by the State Department:

---

attempting to export to the People's Republic of China sensitive submarine technology loaded on unauthorized CDs and was arrested when he was carrying them aboard an international flight. Second, *Mak* was decided before *Reed* where the Supreme Court counseled that "[s]ome facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." 135 S. Ct. at 2230. Third, even if the case is analyzed as a content-based restriction, Mak's prosecution falls comfortably within the traditional understanding of "export." The government's heightened interest in national security is evident, and the Court required the government to prove beyond a reasonable doubt that the technical information he was carrying was not in the public domain.

its warning letter to Defense Distributed identified both "files" and "technical data," which include design drawings, rendered images, and written manufacturing instructions.  Second, CAD files do not "direct a computer" to do anything.  As the amicus Electronic Frontier Foundation explains, "[T]o create a physical object based on a CAD file, a third party must supply additional software to read these files and translate them into the motions of a 3D print head, the 3D printer itself, and the necessary physical materials."  The person must provide know-how, tools and materials to assemble the printed components, *e.g.* treating some parts of the Liberator with acetone to render them functional.  In effect, the "functionality" of CAD files differs only in degree from that of blueprints.  Legally, this argument is an attempt to fit within the *Corley* case, referenced above, which concerned a computer program that by itself provided a "key" to open otherwise copyright-restricted online materials; those facts are far afield from the technical data speech at issue here.  *Corley,* 273 F.3d at 449–55.

Because the regulation of Defense Distributed's speech is content-based, it is necessary to apply strict scrutiny.  The district court erred in applying the lower intermediate scrutiny standard.  I would not dispute that the government has a compelling interest in enforcing the AECA to regulate the export of arms and technical data governed by the USML.  The critical issue is instead whether the government's prepublication approval scheme is narrowly tailored to achieve that end.  A regulation is not narrowly tailored if it is "significantly overinclusive." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 121, 112 S. Ct. 501, 511 (1991).

"[S]ignificantly overinclusive," however, aptly describes the Government's breathtaking assertion of prepublication review and licensing authority as applied in this case.  To prevent foreign nationals from accessing

technical data relating to USML-covered firearms, the government seeks to require all domestic posting on the Internet of "technical data" to be pre-approved or licensed by the DDTC.  No matter that citizens have no intention of assisting foreign enemies directly, communications about firearms on webpages or blogs must be subject to prior approval on the theory that a foreign national *might* come across the speech.  This flies in the face of *Humanitarian Law Project*.  Although a statute prohibiting the provision of "material support and resources" to designated terrorist groups did not violate First Amendment rights where plaintiffs intended to *directly* assist specific terrorist organizations, the Court "in no way suggest[ed] that a regulation of independent speech would pass constitutional muster, even if the Government were to show that such speech benefits foreign terrorist organizations…[or] that Congress could extend the same prohibition on material support at issue here to domestic organizations." 561 U.S. at 36–39, 130 S. Ct. at 2729–30.  The State Department's ITAR regulations, as sought to be applied here, plainly sweep in and would control a vast amount of perfectly lawful speech.

Two exceptions to the regulations do not eliminate the problem of overinclusiveness.  First, general scientific, mechanical, or engineering principles taught in schools is deemed exempt from ITAR as information in the public domain.  This exception does not, however, appear to save from potential regulation and licensing the amateur gunsmith or hobby shooter who discusses technical information about the construction of firearms on an Internet webpage.  Any information so shared is not necessarily "general scientific, mechanical, or engineering principles taught in schools." Underscoring this problem, at oral argument the government would not definitively answer whether the State Department would purport to regulate the posting of such

unclassified technical data that appeared in library books or magazines like Popular Mechanics.

Second, the State Department has taken the position in this litigation that the "public domain" exception applies only to information *already* in the public domain. Its interpretation of the technical data regulations would permit the DDTC to stifle online discussion of any innovations related to USML-covered firearms because new information would, by definition, not be in the public domain already. Amicus Reporters Committee for Freedom of the Press and the Thomas Jefferson Center for the Protection of Free Expression correctly expresses fear about journalists' ability to report, without DDTC approval, on the latest technological innovations related to any items covered by the USML.

Lest this concern of overinclusiveness be perceived as hyperbole, consider that in 2013, CNET published an article containing an unredacted copy of a document detailing performance requirements for unmanned U.S. military surveillance drones.[13] Should CNET have applied for approval or a license from the DDTC prior to publication? The State Department's interpretation of the regulations could lead to that conclusion. See 22 C.F.R. § 121.1, Category VIII, item (i) (technical data related to aircraft and related articles). The USML-related technical discussed there (1) were "exported" because of their availability to foreign persons by publication on the Internet, and (2) the "public domain" exception would be of no avail since the information had not been in the public domain (narrowly defined to exclude

---

[13] *See* Declan McCullagh, *DHS Built Domestic Surveillance Tech into Predator Drones*, CNET (Mar. 2, 2013, 11:30 AM), http://www.cnet.com/news/dhs-built-domestic-surveillance-tech-into-predator-drones/.

the Internet) before publication in the CNET article. On the Government's theory, journalists could be subject to the ITAR for posting articles online.

The State Department also asserts that, somehow, the information published by Defense Distributed would have survived regulatory scrutiny (query before or after submission to DDTC?) if the company had "verified the citizenship of those interested in the files, or by any other means adequate to ensure that the files are not disseminated to foreign nationals." Government brief at 20. Whatever this means, it is a ludicrous attempt to narrow the ambit of its regulation of Internet publications. Everyone knows that personally identifying information can be fabricated on electronic media. Equally troubling, if the State Department truly means what it says in brief about screening out foreign nationals, then the "public domain" exception becomes useless when applied to media like print publications and TV or to gatherings open to the public.

In sum, it is not at all clear that the State Department has *any* concern for the First Amendment rights of the American public and press. Indeed, the State Department turns freedom of speech on its head by asserting, "The possibility that an Internet site could also be used to distribute the technical data domestically does not alter the analysis…." The Government bears the burden to show that its regulation is narrowly tailored to suit a compelling interest. It is not the public's burden to prove their right to discuss lawful, non-classified, non-restricted technical data. As applied to Defense Distributed's online publication, these overinclusive regulations cannot be narrowly tailored and fail strict scrutiny.

3. The First Amendment--Prior Restraint.

The Government's prepublication approval and licensing scheme also fails to pass constitutional muster because it effects a prior restraint on speech.

No. 15-50759

The classic description of a prior restraint is an "administrative [or] judicial order[] forbidding certain communications when issued in advance of the time that such communications are to occur." *Catholic Leadership Coalition of Tex. v. Reisman*, 764 F.3d 409, 437 (5th Cir. 2014) (citing *Alexander v. United States*, 509 U.S. 544, 550, 113 S. Ct. 2766, 2771 (1993)). The State Department's prepublication review scheme easily fits the mold.

Though not unconstitutional *per se*, any system of prior restraint bears a heavy presumption of unconstitutionality. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225, 110 S. Ct. 596, 604 (1990). Generally, speech licensing schemes must avoid two pitfalls. First the licensors must not exercise excessive discretion. *Catholic Leadership Coalition*, 764 F.3d at 437 (citing *Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757, 108 S. Ct. 2138, 2144 (1988)). "[N]arrowly drawn, reasonable and definite standards" should guide the licensor in order to avoid "unbridled discretion" that might permit the official to "encourag[e] some views and discourag[e] others through the arbitrary application" of the regulation. *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 133, 112 S. Ct. 2395, 2402–03 (1992).

Second, content-based[14] prior restraints must contain adequate procedural protections. The Supreme Court has requires three procedural safeguards against suppression of protected speech by a censorship board: (1) any restraint before judicial review occurs can be imposed for only a specified brief period of time during which the status quo is maintained; (2) prompt judicial review of a decision must be available; and (3) the censor must bear the burdens of going to court and providing the basis to suppress

---

[14] As described above, the ITAR regulation of posting to the Internet technical data related to USML-covered firearms is content-based. Thus, it is subject to the procedural requirements set forth in *Freedman v. Maryland*.

the speech. *N.W. Enters. v. City of Houston*, 352 F.3d 162, 193–94 (5th Cir. 2003) (citing *Friedman v. Maryland*, 380 U.S. 51, 58–59, 85 S. Ct. 734, 739 (1965)). In sum, a court reviewing a system of prior restraint should examine "both the law's procedural guarantees and the discretion given to law enforcement officials." *G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1082 (9th Cir. 2006); *see also East Brooks Books, Inc. v. Shelby Cty.*, 588 F.3d 360, 369 (6th Cir. 2009); *Weinberg v. City of Chi.*, 310 F.3d 1029, 1045 (7th Cir. 2002).

To the extent it embraces publication of non-classified, non-transactional, lawful technical data on the Internet, the Government's scheme vests broad, unbridled discretion to make licensing decisions and lacks the requisite procedural protections. First, as explained above, the "export" regulations' virtually unbounded coverage of USML-related technical data posted to the Internet, combined with the State Department's deliberate ambiguity in what constitutes the "public domain," renders application of ITAR regulations anything but "narrow, objective, and definite." The stated standards do not guide the licensors to prevent unconstitutional prior restraints. *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 151, 89 S. Ct. 935, 938 (1969). The State Department's brief actually touts the case-by-case nature of the determination whether to prevent Internet publication of technical data.[15]

In *City of Lakewood v. Plain Dealer Publishing Co.*, for example, the Supreme Court held that a city ordinance insufficiently tailored the Mayor's

---

[15] Compounding confusion, the ITAR grant broad discretion to DDTC to deny an export license if it "deems such action to be in furtherance of world peace, the national security or the foreign policy of the United States, *or is otherwise advisable.*" 22 C.F.R. § 126.7(a)(1) (emphasis added).

discretion to issue newspaper rack permits because "the ordinance itself contains no explicit limits on the mayor's discretion" and "nothing in the law as written requires the mayor to do more than make the statement 'it is not in the public interest' when denying a permit application." 486 U.S. at 769, 108 S. Ct. at 2150–51. Like the "illusory 'constraints'" in *Lakewood, id.* at 769, the ITAR prepublication review scheme offers nothing but regulatory (or prosecutorial) discretion, as applied to the technical data at issue here, in lieu of objective standards. Reliance on the censor's good faith alone, however, "is the very presumption that the doctrine forbidding unbridled discretion disallows." *Id.* at 770. *Cf. Humanitarian Law Project,* 130 S. Ct. at 2728 (listing numerous ways in which Congress had exhibited sensitivity to First Amendment concerns by limiting and clarifying a statute's application and "avoid[ing] any restriction on independent advocacy, or indeed any activities not directed to, coordinated with, or controlled by foreign terrorist groups").

Just as troubling is the stark lack of the three required procedural protections in prior restraint cases. Where a commodity jurisdiction application is necessary, the alleged 45-day regulatory deadline for such determinations seems to be disregarded in practice; nearly two years elapsed between Defense Distributed's initial request and a response from the DDTC. Further, the prescribed time limit on licensing decisions, 60 days, is not particularly brief. *See Teitel Film Corp. v. Cusak,* 390 U.S. 139, 141, 88 S. Ct. 754, 756 (1968).

More fundamentally, Congress has withheld judicial review of the State Department's designation of items as defense articles or services. *See* 22 U.S.C. § 2778(h); 22 C.F.R. § 128.1 (precluding judicial view of the Executive's implementation of the AECA under the APA). The withholding of judicial review alone should be fatal to the constitutionality of this prior restraint

scheme insofar as it involves the publication of unclassified, lawful technical data to the Internet. *See City of Littleton, Colo. v. Z.J. Gifts D-4, LLC,* 541 U.S. 774, 781, 124 S. Ct. 2219, 2224 (2004) (noting that the Court's decision in *FW/PBS, Inc. v. City of Dallas,* interpreting *Freedman*'s "judicial review" safeguard, requires "a prompt judicial decision," as well as prompt access to the courts). And where judicial review is thwarted, it can hardly be said that DDTC, as the would-be censor, can bear its burden to go to court and support its actions.

## C.    The Government's Interest, Balancing the Interests

A brief discussion is necessary on the balancing of interests as it should have been done in light of the facts of this case. No one doubts the federal government's paramount duty to protect the security of our nation or the Executive Branch's expertise in matters of foreign relations. Yet the Executive's mere incantation of "national security" and "foreign affairs" interests do not suffice to override constitutional rights. The Supreme Court has long declined to permit the unsupported invocation of "national security" to cloud the First Amendment implications of prior restraints. *See New York Times Co. v. United States*, 403 U.S. 713, 714, 91 S. Ct. 2140, 2141 (1971) (reversing the grant of an injunction precluding the *New York Times* and the *Washington Post* from publishing the Pentagon Papers, a classified study of United States involvement in Vietnam from 1945–1967); *id.* at 730 (Stewart, J., concurring) (noting that because he cannot say that disclosure of the Pentagon Papers "will surely result in direct, immediate, and irreparable damage to our Nation or its people," publication may not be enjoined consonant with the First Amendment). Indeed, only the most exceptional and immediate of national security concerns allow a prior restraint on speech to remain in place:

## No. 15-50759

the protection as to previous restraint is not absolutely unlimited.  But the limitation has been recognized only in exceptional cases . . . .[n]o one would question but that a government might prevent actual obstruction to its recruiting service or the publication of sailing dates of transports or the number and location of troops. On similar grounds, the primary requirements of decency may be enforced against obscene publications.  The security of the community life may be protected against incitements to acts of violence and the overthrow by force of orderly government.

*Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 716, 51 S. Ct. 625, 631 (1931); *cf. Haig v. Agee*, 453 U.S. 280, 306–08, 101 S. Ct. 2766, 2781–82 (1981) (holding that the Secretary of State's revocation of Haig's passport did not violate First Amendment rights because his actions exposing undercover CIA agents abroad threatened national security).  No such exceptional circumstances have been presented in this case.   Indeed, all that the majority can muster to support the government's position here is that

the State Department's stated interest in preventing foreign nationals—including manner of enemies of this country—from obtaining technical data on how to produce weapons and weapon parts is not merely tangentially related to national defense and national security; it lies squarely within that interest.

Neither the district court nor the State Department offers anything else.[16] With that kind of reasoning, the State Department could wholly eliminate the "public domain" and "scholarly" exceptions to the ITAR and require pre-publication approval of all USML-related technical data.  This is clearly not

---

[16] The State Department notes the fear that a single-shot pistol undetectable by metal-sensitive devices could be used by terrorists.  The Liberator, however, requires a metal firing pin.

No. 15-50759

what the Supreme Court held in the *Pentagon Papers* or *Near* cases. *See generally* L.A. Powe, Jr., The H-Bomb Injunction, 61 U.Colo.L.Rev. 55 (1990).

Without any evidence to the contrary, the court should have held that the domestic Internet publication of CAD files and other technical data for a 3D printer-enabled making of gun parts and the Liberator pistol presents no immediate danger to national security, especially in light of the fact that many of these files are now widely available over the Internet and that the world is awash with small arms.[17]

Further, the government's pro-censorship position in this case contradicts the express position held within the Executive Branch for the nearly forty-year existence of the AECA. The State Department's sudden turnabout severely undercuts its argument that prepublication review and licensing for the publication of unclassified technical data is justified by pressing national security concerns. Indeed, in the late 1970s and early 1980s, at the height of the Cold War, the Department of Justice's Office of Legal Counsel repeatedly offered written advice that a prepublication review process would raise significant constitutional questions and would likely constitute an impermissible prior restraint, particularly when applied to unclassified technical data disseminated by individuals who do not possess specific intent to deliver it to particular foreign nationals. Further, in a 1997 "Report on the Availability of Bombmaking Information," the Department of Justice observed the widespread availability of bombmaking instructions on the Internet, in

---

[17] The Government also vaguely asserts that imposing a prior restraint upon the domestic publication of the technical data here is justified to protect foreign relations with other countries that have more restrictive firearms laws than the United States. Inflicting domestic speech censorship in pursuit of globalist foreign relations concerns (absent specific findings and prohibitions as in *Humanitarian Law Project*) is dangerous and unprecedented.

libraries, and in magazines. The Department of Justice then argued against government censorship, concluding that despite the distinct possibility that third parties can use bombmaking instructions to engage in illegal conduct, a statute "proscrib[ing] indiscriminately the dissemination of bombmaking information" would face First Amendment problems because the government may rarely prevent the dissemination of truthful information.[18]

With respect to the ITAR's regulation of "technical data," DDTC's director has taken the position in litigation that the State Department "does not seek to regulate the *means* themselves by which information is placed in the public domain" and "does not review in advance scientific information to determine whether it may be offered for sale at newsstands and bookstores, through subscriptions, second-class mail, or made available at libraries open to the public, or distributed at a conference or seminar in the United States." Second Declaration of William J. Lowell Department of State Office of Defense Trade Controls at 11, *Bernstein v. U.S. Dep't of State*, 945 F. Supp. 1279 (N.D. Cal. 1996). Moreover, he added, "the regulations are not applied to establish a prepublication review requirement for the general publication of scientific information in the United States." *Id.*

Finally, the State Department's invocation of unspecified national security concerns flatly contradicts its contention that while Defense Distributed's very same technical data cannot be published on the Internet, they may be freely circulated within the U.S. at conferences, meetings, trade shows, in domestic print publications and in libraries. (Of course, as above noted, the Government's sincerity on this point is subject to doubt, based on

---

[18] DEPARTMENT OF JUSTICE, 1997 REPORT ON THE AVAILABILITY OF BOMBMAKING INFORMATION 3, 5–7, 19–29 (1997).

the determined ambiguity of its litigating position.) After all, if a foreign national were to attend a meeting or trade show, or visit the library and read a book with such information in it, under the Government's theory, the technical data would have been "exported" just like the Internet posts, because it was "[d]isclos[ed] (including oral or visual disclosure). . . to a foreign person . . . in the United States or abroad." *Id.* § 120.17(a)(4).

\*\*\*

By refusing to address the plaintiffs' likelihood of success on the merits and relying solely on the Government's vague invocation of national security interests, the majority leave in place a preliminary injunction that degrades First Amendment protections and implicitly sanctions the State Department's tenuous and aggressive invasion of citizens' rights.   The majority's non-decision here encourages case-by-case adjudication of prepublication review "requests" by the State Department that will chill the free exchange of ideas about whatever USML-related technical data the government chooses to call "novel," "functional," or "not within the public domain."   It will foster further standardless exercises of discretion by DDTC censors.

Today's target is unclassified, lawful technical data about guns, which will impair discussion about a large swath of unclassified information about firearms and inhibit amateur gunsmiths as well as journalists.   Tomorrow's targets may be drones, cybersecurity, or robotic devices, technical data for all of which may be implicated on the USML.   This abdication of our decisionmaking responsibility toward the First Freedom is highly regrettable. I earnestly hope that the district court, on remand, will take the foregoing discussion to heart and relieve Defense Distributed of this censorship.